# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 8, 2011 Session

## STATE OF TENNESSEE v. TIFFANY SANDERS McNEAL

**Direct Appeal from the Criminal Court for Davidson County**
**Nos. 2009-D-2911, 2009-D-3417      Cheryl Blackburn, Judge**

---

**No. M2010-01261-CCA-R3-CD - Filed June 14, 2011**

---

The Defendant-Appellant, Tiffany Sanders McNeal, entered guilty pleas in Case No. 2009-D-2911 to two counts of possession with the intent to sell or deliver a controlled substance (one count for a Schedule III drug and one count for a Schedule IV drug), a Class D felony, and in Case No. 2009-D-3417 to one count of attempted aggravated child abuse with a weapon, a Class  C felony, in the Davidson County Criminal Court.  Pursuant to her plea agreement, the remaining counts in Case No. 2009-D-2911 for the delivery of a Schedule III drug and criminal impersonation were dismissed, and McNeal received concurrent sentences of six years with a release eligibility of thirty-five percent for the drug convictions and ten years with a release eligibility of forty-five percent for the attempted aggravated child abuse conviction, for an effective sentence of ten years.  The manner of service of the sentence was determined by the trial court at the sentencing hearing.  On appeal, McNeal argues that the trial court abused its discretion by denying an alternative sentence and a community corrections sentence.  Upon review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Francis King, Nashville, Tennessee, for the Defendant-Appellant, Tiffany Sanders McNeal.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Brian K. Holmgren, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

**Guilty Plea Hearing.**  At the March 11, 2010 guilty plea hearing, the State outlined the facts supporting McNeal's guilty pleas to two counts of possession with the intent to sell or deliver a controlled substance and one count of attempted aggravated child abuse:

> Your Honor, beginning first with file 2009-D-2911, had this matter proceeded to trial, the State's proof would have established that on June [18,] 2009[,] Metro police officers were running an undercover . . . operation in the area of 602 East Old Hickory Boulevard, which is within a thousand feet of Madison Park, hence the drug[-]free area.  An undercover person observed an individual by the name of Stevens who was approached and asked if she knew where to obtain some drugs.  Defendant Stevens made some calls and directed the undercover [person] to the location.  Subsequently a Ford Explorer driven by a second co-defendant, Norris, where Ms. McNeal was located in the back, arrived at the location.  Ms. McNeal and one of the other occupants got out.  There was some conversation involving drug activity.  There was an exchange, and subsequently the vehicle left with Ms. McNeal in it.  Officers approached and stopped the vehicle.  Ultimately[,] Ms. McNeal was located in possession of the Lortabs and Xanax.  She made admissions to the officers that she had picked up prescriptions for her sister and another prescription and that she exchanged some of those [pills] for services in terms of rides and other activities.  Based on those facts that would be the State's proof on that particular file.

> With regard to file 2009-D-3417, had that matter proceeded to trial, our proof would have shown that Ms. McNeal was living in a residence located here in Nashville, Davidson County[,] along with her mother and her daughter, who is the alleged victim.  Her daughter's date of birth is [X-X-XXXX].[1]  This incident occurred on December [14,] 2008[,] at which point [the victim] would have been eight years of age.  If called to testify, [the victim] would have testified that on that particular date she became sick.  She vomited . . . onto the floor.  Her mother, Ms. McNeal, became upset with that and as a result forced [the victim's] head into the floor.  As a result of that, [the victim] sustained some bruising on her face that settled underneath her eyes.  On the next day[, the victim] went to school.  She was observed to have the bruising underneath her eyes.  The school called that in and an investigation was begun.  [The victim] . . . was photographed.  Those photographs were presented to Dr. Piercey, one of the Care Team doctors at Vanderbilt.  Dr. Piercey provided information that the history that [the victim] gave of how that injury was

---

[1]The prosecution recited the victim's birthday, as a required element of the offense.  However, for a multitude of reasons, we choose not to publish the victim's exact birthday in this appeal.

sustained was consistent [with the injuries depicted in the photographs]. Ms. McNeal was interviewed and alleged that she had gotten into a physical altercation with her daughter and that [the victim] may have gotten these injuries from her ring.

Dr. Piercey examined the injuries and determined that [Ms. McNeal's] explanation was not consistent [with the victim's injuries]. In addition[, the victim] had a whip mark across her back, which was a separate injury, which was not charged out [sic]. [Defense counsel] also had the opportunity to meet with [the victim] at our offices and to interview her as well as to speak with Dr. Piercey pursuant to the [c]ourt's orders. Based on those facts[,] we would ask the [c]ourt [to approve] the previously announced agreement.

McNeal acknowledged that the aforementioned facts related to her charges were true before entering her guilty pleas.

**Sentencing Hearing.** At the May 12, 2010 sentencing hearing, the State entered a presentence investigation report into evidence, which showed that McNeal had four felony convictions for obtaining drugs by fraud, theft of property valued at $1,000 or more but less than $10,000, Aid to Families with Dependent Children fraud, and Food Stamp fraud. She also had eight misdemeanor convictions for the following offenses: driving with a suspended, cancelled or revoked license; theft; criminal impersonation; DUI; casual exchange of drugs; violation of the driver's license law; and accessory after the fact. The State then entered photographs of the victim's injuries and noted that the defense would enter additional photographs showing that the victim's injuries quickly dissipated. In addition, the parties entered the following stipulated statement of facts:

1.     [McNeal] has been incarcerated at the Davidson County Correctional Development Center since June 18, 2009, following her arrest with respect to the charges that are the subject of Case No. 09-D-2911.

2.     The incident referred to in the Indictment in Case No. 09-D-3417 occurred on December 14, 2008, which was a Sunday.

3.     At the time of the incident referred to in the Indictment in Case No. 09-D-3417, the victim, [McNeal's daughter] . . . was eight years . . . old.

4.     Following the incident referred to in the Indictment in Case No. 09-D-3417, the victim, [McNeal's daughter]: a) was not hospitalized; b) was not diagnosed as having sustained any fractured bones; c) was not required to take any prescription medication for her injuries; d) was

-3-

able to attend school the following day; e) did not miss any days from school as a result of the incident or her injuries; and f) did not suffer any permanent injury, scarring or disfigurement.

5.     On January 13, 2009, during her video-taped forensic interview at the office of the District Attorney General, the victim, [McNeal's daughter], stated that: a) during the incident referred to in the Indictment in Case No. 09-D-3417, her mother had "shoved my face in my puke"; b) her mother had never done anything like that before, but had only punished her by putting her "in the corner or spanking [her] bottom"; and c) the day after the incident, her mother told her, "I'm sorry."

6.     Other than the charge of attempted aggravated child abuse to which [McNeal] has plead[ed] guilty in Case No. 09-D-3417, she has never been charged with or convicted of an offense involving any type of violent crime; all of [McNeal's] prior convictions, including probation violations, have been related to charges involving the illegal possession or sale of controlled substances, as well as prescription fraud and identity theft committed in connection with efforts by [McNeal] to illegally obtain controlled substances.

7.     By letter, dated January 22, 2010, The Next Door – Nashville, an accredited, in-patient rehabilitation facility, informed [McNeal] that she had been approved for admission into its residential transition center program, which requires a minimum commitment of six months. A copy of that letter is annexed hereto as Exhibit A.

McNeal provided testimony in her own behalf at the sentencing hearing. She testified that she was twenty-nine years old and had been incarcerated for the charges in this case for approximately a year. She stated that she was raised by her grandparents from the time she was five years old because her mother had a drug problem and that her grandfather owned restaurants in Nashville for approximately fifty years. McNeal stated that her grandparents had always taken care of her financially. She said she "never was made to work, only if [she] wanted to [work] in the family businesses." Her grandfather bought her "a home, car, everything." After her grandparents passed away, everything she had was in her grandfather's name. She said, "[B]ecause I didn't have the credit or the financial ability to continue paying for the things [I had been given,] I was forced to sell everything." She eventually filed for bankruptcy.

McNeal said that she had three children, ages thirteen, nine, and three years old. She said she gave birth to her oldest child when she was seventeen years old and a sophomore in high school. She did not continue in school but obtained her GED the following year. She married James Fenton, Sr., the father of her oldest child, but divorced him six months later. She said that she was currently married to Robert McNeal, the father of her second child. However, both Robert McNeal and James Fenton, Sr. were incarcerated at the time of the sentencing hearing.

McNeal said that she first smoked marijuana at age fourteen or fifteen. After she lost her grandparents, she began selling pills and marijuana in order to try to pay for her home and support her children. During that time, she became addicted to opiates.

Since her incarceration, McNeal stated that she had participated in a tutoring program that taught inmates how to read, write, and obtain their GED. She also said that she had been accepted into a outpatient drug rehabilitation center, parenting class, and recovery program:

> The Next Door, [an outpatient drug rehabilitation center,] c[a]me out and interviewed me and accepted me back in January. I've kept in contact with Ms. [K]risty Pomeroy . . . ever since to make sure there was a bed held for me. Community recovery, I filled out [an] application and was accepted there. I know that . . . there's no guide to being a parent, but I felt like if I got involved with the parenting classes it would help. So a friend of mine, James Long, helped pay for it. It was $60, and it's an eight[-]week class. I [also] got involved with Skyline Outreach Program. It's an intensive outpatient treatment center. It's, I think, six or eight weeks long. And then they have like a continuing recovery program.

McNeal also discussed the December 14, 2008 incident with her daughter. She claimed that she initially saw her daughter taking cigarettes and a lighter out of the house and became worried because her daughter had set the house on fire with a candle two years ago and, two months after that incident, had stuck a Q-tip into a wall heater and started a fire. She tried to take the cigarettes and the lighter away from her daughter, who fought her until the cigarettes and lighter fell to the floor. McNeal claimed that when her daughter tried to run away, "she tripped over something on the floor, [and] fell." Then[,] because of "crying or coughing from crying[,]" her daughter vomited on the floor. McNeal said, "[W]ithin seconds, I just pushed her head down one time, and I just stood there." She later noticed red spots under her daughter's eyes. Shortly thereafter, McNeal told her daughter that she was sorry. Her daughter went to school the next day, and the school notified the police. McNeal confirmed that her daughter did not miss any time from school, did not receive any medical treatment or medication, and did not suffer any fractures or permanent scarring or disfigurement as a result of the incident. She said her daughter's injuries were limited to a

-5-

small bruise under each eye.  However, she emphasized that the indictment charging her with child abuse was a turning point for her:

> [W]hen I was indicted [for the case involving my daughter,] I got scared because I kn[e]w it was very serious.  And I thought about what I needed to do to try to change my life, the drugs, all the things that . . . had been going on over the years.  So I put a plan together, a treatment plan, that I thought would show that I want to change.  I want structure in my life, I want to get clean, have a job, and get my kids back.  So I worked on my plan, my treatment plan. I got – I talked to many, many people in recovery at halfway houses.  I went to many AA meetings that c[a]me up to the jail on Saturday nights.

McNeal then identified the following documents, which were entered as a collective exhibit:  (1) an acceptance letter from the Skyline intensive outpatient drug rehabilitation program, a structured program that includes random drug screens; (2) a document describing the parenting classes offered by the Exchange Club Family Center; (3) a document describing the supervised visitation and aftercare services provided by the Exchange Club; (4) a receipt for parenting classes through the Exchange Club; (5) an acceptance letter from the Next Door drug rehabilitation center and halfway house, which required a six month minimum stay; (6) an acceptance letter from Recovery Community, another halfway house; (7) a certificate from the tutoring program where she helped inmates learn to read, write, and obtain their GEDs; (8) a letter from a cleaning service stating that the service would hire McNeal upon her release from prison.  McNeal stated that she had kept in touch with all of the individuals mentioned in the aforementioned exhibits "to make sure they knew who I was, to make sure they know that I'm serious and that I want help."

McNeal acknowledged that she had been sent to a forty-five day drug rehabilitation program at the jail when she first violated her probation for her conviction for obtaining a prescription by fraud.  She said that she attended only two weeks of the rehabilitation program before she was released from jail.  When she violated her probation for that conviction a second time, she was sent to the Elam Center for a detoxification program that lasted twenty-eight days.  McNeal stated that her previous experiences with drug rehabilitation did not involve comprehensive programs like that of Next Door or Recovery Community.

On cross-examination, McNeal acknowledged that she had been placed on misdemeanor probation for a DUI and had been placed on probation for two years for her felony conviction for obtaining drugs by fraud.  In addition, she acknowledged that she would be required to serve a four-year sentence of community corrections or probation in Sumner County following the completion of her two-year probationary sentence.  She also admitted that she had violated her probation for her conviction of obtaining drugs by fraud

four different times, three of which resulted in her incarceration, and two of which resulted in her being sent to rehabilitation programs for short periods of time. She acknowledged that she was alleged to have violated her probation because of two arrests for domestic violence involving the mother of her brother's children, both of which were dismissed. McNeal stated that she tested positive for opiates three times while serving her two-year probationary sentence.

Regarding the child abuse charge with her daughter, McNeal stated that she told the police that she did not push her daughter's face into the floor but acknowledged that this was not the truth. At the sentencing hearing, she admitted that she was under the influence of opiates at the time of the incident involving her daughter. When the State challenged her about her involvement in her daughter's injuries, McNeal stated: "[My daughter] did fall. She tripped. When I sat her down, she did trip. And I was under the influence of drugs. And yes, I did not [tell the police] that I pushed [my daughter's] head down." However, she denied using "a lot of force" when she pushed her daughter's head into the floor.

When asked by the State why she was able to line up rehabilitative programs and a job prior to her sentencing hearing but was unable to abide by the terms of her prior probationary sentences, McNeal stated:

> I can say this. I never did more than three and a half months in jail [on my prior convictions]. [This time] I've been in jail a year. I've had – other than writing my children no contact with my kids. I've not had much help at all being in jail this time. And these charges are very serious, and I know this is – this might be my last chance to get my family back together. So I tried my best to figure out the best way to get [into] a structured program because I need structure. That's why I put all that together.

McNeal admitted that she had four prior felony convictions for which she had received probation. These convictions included a felony conviction for theft of property in Sumner County which occurred at her brother's girlfriend's house. She claimed another lady kicked the door into that dwelling before she and her sister retrieved their children's clothes from the residence. Despite her prior probationary sentences, she admitted that she continued to participate in criminal activity, including committing the offenses in this case. She also admitted that she had a history of receiving new criminal charges while she was released on bond for other offenses. She claimed that she committed all of her previous offenses because she was using drugs.

The trial court stated that it had reviewed McNeal's file from her conviction for obtaining drugs by fraud, which established that she was released from the Elam Center's twenty-eight day detoxification program, was placed back on probation on June 16, 2009,

and then committed the drug offenses in this case two days later on June 18, 2009. As a result, her probation was revoked. Several months later, she filed a motion asking to be placed on probation a second time, which was granted on December 15, 2009, on the condition that if she violated her probation again she would be required to serve her sentence in confinement. However, McNeal stated that she was never actually released on probation because she received the new charges in this case on December 12, 2009. She stated that the trial judge who granted her request for probation was aware of the new charges in this case. When the court questioned her ability to follow the terms of an alternative sentence this time, McNeal stated:

> I don't want to go home. I want to get my life together. I want to see my kids and eventually get them back. That's why I pulled all this together with the most structured halfway house there is in Nashville because I know I need that, Your Honor. I can't just walk out a door and go right back into the free world without some type of help from people that are in recovery, people that know how to deal with this type of thing.

The defense then called Deborah Mangrum, McNeal's mother, who identified several photographs of McNeal's daughter depicting her physical condition on December 25, 2008, eleven days after the incident in this case. Mangrum stated, "This one is [McNeal's daughter] opening one of the many gifts, and she's smiling very happily, no bruises under the face, no discoloration. As anyone can look at [sic], she's in perfect condition."

At the close of proof at the sentencing hearing, the trial court noted that the only issue it had to determine was whether McNeal should receive an alternative sentence. After hearing closing arguments, the court stated:

> I am now required to consider the purposes of the sentencing act, which is outlined at 40-35-102, as well as the factors that I am to consider, which are outlined at 40-35-210[(b)], which would be the evidence at the sentencing hearing, the presentence report, the principles of sentencing, and arguments as to alternatives. And because of the length of the sentence and the nature of the crime she is afforded the opportunity for me to consider that. The nature and characteristics of the criminal conduct, in considering that I can look at the true nature of the offenses committed, which is going behind the plea agreement, the enhancing and mitigating factors . . ., the statistical information and the Administrative Office of the Courts provides that periodically and I do review that and the defendant's statement.

The court added that the "mitigating and enhanc[ement] factors are not all that important in this particular case[,]" since the sentence length was set in the guilty plea agreement.

However, the court noted that McNeal had "a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." T.C.A. § 40-35-114(1) (2006). In addition, the court noted that McNeal had "failed to comply with conditions of a sentence involving release into the community." Id. § 40-35-114(8) (2006). The court determined that no mitigating factors applied to McNeal's case. See id. § 40-35-113 (2006).

In determining the manner of service of McNeal's sentence, the court stated:

> Now, I have to look at whether confinement is necessary to protect society by restraining someone who has a long history of criminal conduct. Well, [McNeal] has a long history, but not long like some people I've seen. [The next factor is whether confinement is n]ecessary to avoid the depreciation of the seriousness of the offenses and suited to provide . . . effective deterrence to others likely to commit similar offenses. That would not apply to the drug cases. [I]t might [arguably] apply to the . . . attempted child abuse [conviction]. But where Ms. McNeal has her problem is that measures least restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. I mean, I don't have to look any further than [McNeal's conviction for obtaining drugs by fraud]. Over and over again we've given her an opportunity to address this drug problem. . . . Even by her own admission, she was doing drugs when she hurt[] her child. [The] problem, though, is the length of the sentence [regarding her attempted aggravated child abuse conviction]. . . . I'm going to deny Ms. McNeal probation because of her total history of being unable to [abide by the terms of her previous probationary sentences]. And I would do that if it [were] just the drug case. Without any respect to the child abuse case I would be denying Ms. McNeal probation because of [her previous inability to comply with the terms of her probation.]

At the conclusion of the sentencing hearing, the trial court denied alternative sentencing and determined that McNeal would serve her effective sentence of ten years in the Tennessee Department of Correction. McNeal filed a timely notice of appeal.

## ANALYSIS

McNeal argues that the trial court abused its discretion in denying an alternative sentence and community corrections. In response, the State contends that McNeal's sentences are proper and that the trial court's judgments should be affirmed.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d) (2006), Sentencing Comm'n Comments. This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court "may not disturb the sentence even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Because the trial court in this case properly considered the sentencing principles and all relevant facts and circumstances, our review is de novo with a presumption of correctness. See Ashby, 823 S.W.2d at 169.

A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006); see also State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002); State v. Osborne, 251 S.W.3d 1, 24 (Tenn. Crim. App. 2007).

**II. Denial of Alternative Sentencing.** McNeal asserts that the trial court, in focusing on the drug cases, gave almost no consideration to the mitigating circumstances of the attempted aggravated child abuse offense and failed to compare the facts in the attempted

aggravated child abuse case to other more serious child abuse cases in which defendants received alternative sentencing. In addition, she claims the trial court gave almost no consideration to evidence regarding her steps toward rehabilitation while incarcerated that favored a full or partial alternative sentence. Finally, she argues that the trial court failed to impose the least severe sentence appropriate in this case, since her previous probation violations did not make her ineligible for alternative sentencing in this case.

In response, the State argues that the sentence imposed by the trial court was "fully justified[,]" given that "the court considered all the correct sentencing principles before concluding that confinement was necessary on the grounds that the defendant had a long, repetitive, and recent history of not complying with felony sentences allowed to be served on probation." It also notes that the presentence report and McNeal's admissions show that she received convictions for offenses committed while she was released on bond or probation. The State further notes that McNeal was given previous drug rehabilitation opportunities which failed to result in success. Regarding McNeal's argument that the court failed to consider the mitigating circumstances of her attempted aggravated child abuse conviction, the State contends that the court's failure to give any weight to these circumstances does not mean that the court failed to apply the purposes and principles of the sentencing act. We agree with the State.

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(5) (2003) gives courts guidance regarding the types of individuals who should be required to serve their sentence in confinement:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure to past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

McNeal erroneously contends that she is a favorable candidate for alternative sentencing. Since McNeal is a Range II offender, rather than an especially mitigated or standard offender, she is not considered a favorable candidate for alternative sentencing. See T.C.A. § 40-35-102(6) (2006).

McNeal also argues that the trial court should have given her a probationary sentence. A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. Id. § 40-35-303(a) (2006). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants. Id. § 40-35-303(b) (2006). However, "the

-11-

defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b) (2006), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. See State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citation omitted). Importantly, the defendant has the burden of establishing suitability for full probation. See T.C.A. § 40-35-303(b) (2006). In determining whether to deny probation and impose a sentence of total confinement, the trial court must consider if:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C) (2003). See also Ashby, 823 S.W.2d at 169.

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, his present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285 (Tenn. 1978)). The court should also consider the potential for rehabilitation or treatment of the defendant in determining the appropriate sentence. See T.C.A. § 40-35-103(5) (2006). In addition, the principles of sentencing require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4) (2006). Finally, the trial court shall consider the mitigating and enhancement factors stated in sections 40-35-113 and -114 before determining whether the defendant should receive probation. See id. § 40-35-210(b)(5).

Here, McNeal agreed to an effective ten-year sentence pursuant to her plea agreement, thereby making her eligible for probation. The record shows that the trial court properly considered the purposes and principles in the sentencing act. In considering the enhancement factors, the court noted that McNeal had a previous history of criminal convictions in excess of those necessary to establish her range and had failed to comply with conditions of a sentence involving release into the community. See id. § 40-35-114(1), (8) (2006). The court did not apply any mitigating factors. See id. § 40-35-113 (2006). The trial court then

determined that a sentence of total confinement was appropriate because McNeal had "a long history of criminal conduct" and because "[m]easures less restrictive than confinement [had] frequently or recently been applied unsuccessfully to [her]." Id. § 40-35-103(1)(A), (C) (2006). In addition, in considering whether "[c]onfinement [was] necessary to avoid depreciating the seriousness of the offense" or was "particularly suited to provide an effective deterrence to others likely to commit similar offenses[,]" the court held that although this factor did not apply to the drug cases, "it might [arguably] apply to the . . . attempted child abuse [conviction]." Id. § 40-35-103(1)(B) (2006). We conclude that the record supports the trial court's denial of alternative sentencing in this case. We further conclude that McNeal has failed to establish her suitability for full probation.

**III. Community Corrections Sentence.** McNeal claims the trial court abused its discretion in denying a community corrections sentence, especially since she qualified for such a sentence under the "special needs" provision. In response, the State argues that the trial court explicitly denied all alternative sentencing options and that decisions in other cases do not control whether the trial court in this case properly applied the purposes and principles of the sentencing act in imposing McNeal's sentence of confinement. It further contends that this court has previously held that a conviction for attempted aggravated child abuse prevents a defendant from receiving a community corrections sentence. See State v. Grady Stanley Ingram, No. 03C01-9612-CR-00464, 1998 WL 30529, at *3 (Tenn. Crim. App., at Knoxville, Jan. 8, 1998) (citing State v. Birge, 792 S.W.2d 723, 725 (Tenn. Crim. App. 1990)) (Because of the violent nature of the offense, "the attempted aggravated child abuse conviction precludes consideration for the Community Corrections program."); see also T.C.A. § 40-36-106(a)(1)(B), (C). Regarding the "special needs" provision, the State argues that McNeal's previous failures at drug rehabilitation support the trial court's decision not to release her in to the community. See State v. Willie Aaron Radden, No. 03C01-9408-CR-00280, 1995 WL 79204, at *4 (Tenn. Crim. App., at Knoxville, Feb. 24, 1995) ("[T]he record of the defendant's prior, unsuccessful attempts to deal with his addiction to drugs and alcohol does not indicate that his needs are better treated or better served by his release into the community."), perm. to appeal denied (Tenn. Sept. 5, 1995). We agree with the State.

The intent of the Community Corrections Act was to "[e]stablish a policy within the state to punish selected, nonviolent felony offenders in front-end community based alternatives to incarceration, thereby reserving secure confinement facilities for violent felony offenders." T.C.A. § 40-36-103(1) (2006). Eligible offenders under the Community Corrections Act include:

(A) Persons who, without this option, would be incarcerated in a correctional institution;

(B) Persons who are convicted of property-related, or drug-or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence;

(F) Persons who do not demonstrate a pattern of committing violent offenses; and

(2) Persons who are sentenced to incarceration or are on escape at the time of consideration will not be eligible for punishment in the community.

Id. § 40-36-106(a)(1)(A)-(F), (2) (2006). Simply because an offender meets the minimum requirements under the Community Corrections Act "does not mean that he is entitled to be sentenced under the Act as a matter of law or right." State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998) (citing State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987)). Instead, the Act's criteria "shall be interpreted as minimum state standards, guiding the determination of eligibility of offenders under this chapter." T.C.A. § 40-36-106(d) (2006).

In this case, the trial court determined that McNeal should serve a sentence of total confinement because she had "a long history of criminal conduct" and because "[m]easures less restrictive than confinement [had] frequently or recently been applied unsuccessfully to [her]. Id. § 40-35-103(1)(A), (C) (2006). Our review of the record supports the trial court's denial of community corrections and the imposition of a sentence of confinement in this case.

McNeal specifically claims that she is eligible for a community corrections sentence under the "special needs" provision, which states:

-14-

Felony offenders not otherwise eligible under subsection (a), and who would be usually considered unfit for probation due to histories of chronic alcohol or drug abuse or mental health problems, but whose special needs are treatable and could be served best in the community rather than in a correctional institution, may be considered eligible for punishment in the community under the provisions of this chapter.

Id. § 40-36-106(c) (2006).

First, before being eligible for a community corrections sentence under subsection (c), the offender must be eligible for probation. State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996) (citing State v. Staten, 787 S.W.2d 934, 936 (Tenn. Crim. App. 1989); State v. Lanny Crowe, No. 01C01-9503-CC-00064, 1995 WL 392967, at *1 (Tenn. Crim. App., at Nashville, July 6, 1995)). Second, the trial court must determine whether the offender is suitable for placement in the community corrections program by finding the following:

(1) the offender has a history of chronic alcohol, drug abuse, or mental health problems, (2) these factors were reasonably related to and contributed to the offender's criminal conduct, (3) the identifiable special need (or needs) are treatable, and (4) the treatment of the special need could be served best in the community rather than in a correctional institution.

Id. at 439 (citing State v. Robert Wilson, No. 03C01-9209-CR-00305, 1993 WL 79626, at *5 (Tenn. Crim. App., at Knoxville, Mar. 22, 1993)).

Although the trial court did not explicitly make findings that she was denying community corrections based on the factors in Boston, the record does show that the court touched on each one of these factors in her ruling. Moreover, the court made extensive findings that McNeal was not entitled to an alternative sentence in this case. The presentence report shows that McNeal had four felony convictions, eight misdemeanor convictions, at least four probations violations, and committed at least four offenses while released on bond or on probation. In addition, the record shows that McNeal had already been sent to drug rehabilitation programs twice through the court system. Ultimately, the trial court determined that confinement was necessary because McNeal had "a significant history of criminal conduct" and that "[m]easures less restrictive than confinement [had] recently been applied unsuccessfully to [her]." T.C.A. § 40-35-103(1)(A), (C) (2006). Based on the

-15-

circumstances in this case, we conclude that the record supports the trial court's imposition of a sentence of confinement. <u>See</u> <u>State v. Darrell L. Tate</u>, No. 03C01-9707-CC-00233, 1998 WL 563965, at \*2 (Tenn. Crim. App., at Knoxville, Sept. 1, 1998) (affirming the trial court's judgment of split confinement where the defendant failed to take responsibility for his actions and had multiple probation revocations, despite the fact that the court failed to make any specific findings regarding its refusal to place the defendant in a community corrections program). Accordingly, McNeal's effective ten-year sentence in the Tennessee Department of Correction is proper.

## CONCLUSION

Upon review of the record, we affirm the trial court's judgments.

_____
CAMILLE R. McMULLEN, JUDGE